

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-17-1994

# PA Funeral Dir. Assn. v. FTC

Precedential or Non-Precedential:

Docket 94-3015

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"PA Funeral Dir. Assn. v. FTC" (1994). *1994 Decisions.* Paper 155.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/155

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-3015


PENNSYLVANIA FUNERAL DIRECTORS ASSOCIATION, INC.,

Petitioner

v.

FEDERAL TRADE COMMISSION,

Respondent


Petition for Review of the Federal Trade Commission's
Amended Funeral Industry Practices Regulation Rule


Argued August 2, 1994

BEFORE:  STAPLETON and GREENBERG, Circuit Judges,
         and ATKINS,* Senior District Judge

(Filed October 17, 1994)

T. Scott Gilligan (Argued)
Kepley, MacConnell & Eyrich
525 Vine Street Suite 2200
Cincinnati, OH 45202

       Attorney for Petitioner
       and Intervenor


Jay C. Schaeffer
Acting General Counsel
Ernest J. Isenstadt
Assistant General Counsel
Joanne L. Levine (Argued)
Federal Trade Commission
6th & Pennsylvania Ave., N.W.
Washington D.C. 20580

*  Honorable C. Clyde Atkins, Senior United States District Judge for the Southern District of Florida, sitting by designation.

Of Counsel:
Matthew Daynard
Bureau of Consumer Protection
Federal Trade Commission
6th & Pennsylvania Ave., N.W.
Washington D.C. 20580

                    Attorneys for Respondent


Cathy Ventrell-Monsees
Steven S. Zaleznick
W. Kent Brunette
Deborah M. Zuckerman
American Association of Retired
Persons
601 E Street, N.W.
Washington D.C. 20049

Of Counsel:
Allen Larson
Eugene Curry
Larson & Curry
Route 28-1185 Falmouth Rd.
P.O. Box 2730
Hyannis, MA 02601

                    Attorneys for Amicus
Curiae

OPINION OF THE COURT



ATKINS, Senior District Judge:


The Pennsylvania Funeral Directors Association, Inc. and the National Funeral Directors Association of the United States, Inc. as intervenor (collectively "PFDA"), have petitioned this court, pursuant to Section 18(e) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 57a(e), for review of the

Federal Trade Commission's ("FTC") amended Funeral Industry Practices Rule. The PFDA specifically asks this court to invalidate an amendment to the original Funeral Industry Practices Rule ("Funeral Rule") which prohibits all funeral service providers from charging consumers a "casket handling fee" in instances where the consumer has purchased a casket from a party other than the funeral service provider -- i.e., from a third party casket vendor. The PFDA contends that the FTC's decision to implement a ban on casket handling fees was arbitrary and capricious and that the factual findings underlying that decision were unsupported by substantial evidence in the rulemaking record taken as a whole. For the reasons set forth below, we will affirm the amended Funeral Rule, and in particular the ban on casket handling fees.

## PROCEDURAL HISTORY

On September 24, 1982, the FTC promulgated the Funeral Rule, which prohibited certain unfair and deceptive practices in the funeral service industry. Trade Regulation Rule; Funeral Industry Practices, 16 C.F.R. Part 453 (1982). The FTC's decision to issue the Funeral Rule was appealed to the Fourth Circuit, and was affirmed in Harry & Bryant Co. v. FTC, 726 F.2d 993 (4th Cir. 1984), cert. denied, 469 U.S. 820 (1984). The Funeral Rule became effective on April 30, 1984.

One section of the Funeral Rule required the FTC to initiate rulemaking proceedings within four years of the effective date of the Funeral Rule to determine whether the

Funeral Rule should be amended or repealed.  Pursuant to this provision, the FTC issued an Advanced Notice of Proposed Rulemaking on May 31, 1988, which included the proposed language for the amendment under challenge in this case.

In January, 1994, after comprehensive rulemaking proceedings, the FTC adopted the amendment to the Funeral Rule which is at issue here;  that amendment bans casket handling fees.  On January 14, 1994, the PFDA petitioned this court for review of the amendment.  The National Funeral Directors Association of the United States, Inc., of which Pennsylvania Funeral Directors Association, Inc. is a member, sought and was granted permission to intervene.

## FACTS

The Funeral Rule

The Funeral Rule was enacted on September 24, 1982, after extensive rulemaking proceedings and became fully effective on April 30, 1984.  The Funeral Rule was premised on evidence that consumers are uniquely disadvantaged when they purchase funeral services after the death of a loved one, due to grief, time constraints, and inexperience.  Additionally, the evidence showed that funeral service providers often sold only preselected packages of goods and services such that consumers were forced to purchase goods and services they did not want.

Therefore, the Funeral Rule set forth several requirements and prohibitions to remedy the unfair practices. Specifically, the Funeral Rule required funeral service providers

to disclose prices over the telephone and to supply each customer with an itemized price list with every service and good that the provider sold.  Additionally, the Funeral Rule required funeral service providers to "unbundle" their price packages, forbidding them from requiring the purchase of a casket for direct cremations and from conditioning the purchase of funeral goods or services on the purchase of any other goods or services;[1]  the purpose was to prevent funeral service providers from forcing customers to purchase goods or services they did not want.[2]  However, recognizing that each funeral requires the service of a funeral director and staff, the Funeral Rule permitted funeral service providers to charge a non-declinable fee for their professional services.

Several groups challenged the promulgation of the Funeral Rule in 1982 on evidentiary, policy, procedural, statutory, and constitutional bases.  However, the Fourth Circuit rejected the challenge and affirmed the Funeral Rule.  Harry & Bryant, 726 F.2d 993.

The Amendment Procedures

The Funeral Rule specified that, four years after it took effect, the FTC would initiate a rulemaking amendment proceeding to determine whether the Funeral Rule was operating

---

[1]Funeral service providers could still offer packages as an option to consumers, but they had to offer each good and service separately, as well.

[2]Other provisions exist in the Funeral Rule, but they are not relevant to our decision regarding the challenged amendment.

effectively, whether any amendments to the Funeral Rule were needed, and whether the entire rule should be repealed. The FTC started the rulemaking proceedings in December, 1987, when it solicited comments on the Funeral Rule from consumers and funeral service providers. More than 350 comments were submitted. The majority of the comments came from people and entities which favored retaining and/or strengthening the Funeral Rule. Most funeral service providers, however, favored repealing or weakening the Funeral Rule.

In May, 1988, the formal rulemaking proceedings began when the FTC issued a Notice of Proposed Rulemaking. This notice informed recipients that the issue of banning casket handling fees would be considered by the FTC. More comments were submitted (189), public hearings were held in three cities, and evidence, including surveys, was presented to a presiding officer. After the testimony of 83 witnesses was presented, interested groups submitted rebuttal statements and proposed findings, as well as comments on later reports filed by the FTC staff.

The Casket Handling Fee Amendment

Prior to the enactment of the Funeral Rule, funeral service providers (i.e., funeral homes) were virtually the only parties selling funeral goods. However, after the implementation of the Funeral Rule, the way was paved for third parties to provide various funeral goods -- namely caskets. Because funeral service providers could no longer require a consumer to purchase a casket in order to receive any other funeral services, third

parties stepped into the markets, but only in some areas.[3]  The
third parties began selling caskets, primarily on a pre-need
basis and usually at a substantially lower price than did the
funeral homes.[4]

In reaction to the increased competition in the area of
casket sales, funeral service providers began charging customers
a "casket handling fee."  This fee averages $300.00 to $500.00,
but can be as high as $1,000.00.  Funeral service providers
charge this fee to customers who have purchased a casket from a
third party, but who want to have the remainder of the funeral
services conducted at the funeral home.  The casket handling fee
is non-declinable, but funeral service providers do not charge
this fee for "ship-ins," among other select customers.[5]
Additionally, funeral service providers admit that there is
absolutely no additional labor or service or handling involved
when a customer provides a casket from a third party to justify

---

[3]Since many states require a person to be a licensed funeral
service provider in order to be able to sell a casket, it is in a
limited amount of states and areas that third parties were able
to enter the market.

[4]Funeral service providers generally seek to recoup their
overhead costs and profits through the sale of caskets.  Thus,
the mark-up on caskets at funeral homes is substantial and is
often higher than a third party seller marks up his or her casket
price.

[5]"Ship-ins" occur, for example, when the family resides in a
place other than where the deceased died.  In those cases, a
funeral home in the city where the person died will prepare the
body and provide a casket.  That funeral home then "ships" the
casket to the funeral home that will conduct the funeral.

such a fee.  Rather, the casket handling fee is imposed solely to recover income from the "lost sale" of the casket.

The casket handling fees often negate any savings the consumer might have realized by buying a third party, less expensive casket.  In fact, sometimes the imposition of the casket handling fee results in a higher overall "price" for a third party casket as opposed to the caskets sold by funeral homes.  As a result, some consumers cancel their third party casket purchases since they would end up paying more overall than if they simply bought the casket from the funeral home. Increased cancellations have evidently caused third party casket sellers to be forced out of the market.  Therefore, the FTC promulgated the following as amended Section 453.4(b)(1)(ii) of the Funeral Rule which makes it an unfair practice for a funeral service provider to:

> Charge any fee as a condition to furnishing any funeral goods or funeral services to a person arranging a funeral, other than a fee for:  (1) Services of funeral director and staff, permitted by § 453.2(b)(4)(iii)(C); (2) other funeral services and funeral goods selected by the purchaser;  and (3) other funeral goods or services required to be purchased [by law]. . .

16 C.F.R.§ 453.

The FTC did not intend the amended Funeral Rule to prohibit funeral service providers from recouping overhead costs or making profits.  Rather, the amendment was intended to make clear that only one non-declinable fee could be charged (the one for the professional services of the funeral director), and that

funeral service providers could not seek to recoup overhead and make profits by only charging a casket handling fee to those people who chose to purchase their casket from a competitor.

## STANDARD OF REVIEW

The FTC asserts that the amendment at issue here is entitled to a presumption of validity because it merely closes a loophole in the original Funeral Rule, and clarifies the ban on "bundling." However, any substantive amendment to an FTC trade regulation rule is subject to the same judicial review as a rule. Section 18(d)(2)(B) of the FTC Act, 15 U.S.C. § 57a(d)(2)(B). While the amendment may be related to "unbundling," which was addressed by the original Funeral Rule, the amendment is not merely a clarification. Rather, the amendment at issue here prohibits a practice that was not being used by funeral service providers at the time the Funeral Rule was enacted. Further, nothing in the FTC Act indicates that amendments are entitled to a presumption of validity.

On the other hand, to the extent that some bases for the original Funeral Rule apply here, this court can look to the Fourth Circuit's findings in Harry & Bryant Co., 726 F.2d 993 for guidance. Therefore, the court will consider the amendment as it would any FTC regulation rule, taking into consideration that the Fourth Circuit has already sustained the FTC's findings that bundling and tying provisions harm consumers, that consumers cannot avoid such injury, and that the benefits of regulating bundling practices outweigh the costs.

Congress established a hybrid standard for judicial review of FTC regulation rules. Essentially, a court may set aside the FTC conclusion if it is not supported by substantial evidence in the rulemaking record taken as a whole, 15 U.S.C. § 57a(e)(3), American Home Products Corp. v. FTC, 695 F.2d 681, 686 (3d Cir. 1982), or if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. American Financial Services v. FTC, 767 F.2d 957, 985 (D.C. Cir. 1985), cert. denied, 475 U.S. 1011 (1986); American Optometric Association v. FTC, 626 F.2d 896, 904-906 (D.C. Cir. 1980). The substantial evidence standard is applied only to the FTC's factual determinations, while the arbitrary and capricious standard is applied to all other determinations and conclusions. American Financial Services, 767 F.2d at 985.

A factual finding is supported by substantial evidence if the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." American Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 522 (1981); American Home Products Corp., 695 F.2d at 686; American Financial Services, 767 F.2d 957. A court is not permitted to reweigh the evidence when determining whether the record contains substantial evidence to support the FTC's conclusion. Steadman v. SEC, 450 U.S. 91, 98-99, 100 n.20 (1981), reh'g. denied, 451 U.S. 933 (1981); Limerick Ecology Action, Inc. v. Nuclear Regulatory Commission, 869 F.2d 719, 753 (3d Cir. 1989); American Home Products Corp., 695 F.2d at 686.

The arbitrary and capricious standard is very deferential.  Environmental Defense Council v. Costle, 657 F.2d 275, 283 (D.C. Cir. 1981);  see Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986), cert. denied, 482 U.S. 905 (1987).  When considering agency conclusions under the arbitrary and capricious standard, the court must determine whether the decision was based on consideration of relevant factors and whether there has been a clear error of judgment. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971);  see Davis Enterprises v. EPA, 877 F.2d 1181, 1186 (3d Cir. 1989), cert. denied, 493 U.S. 1070 (1990).  Additionally, the court may not substitute its judgment for that of the agency. Arkansas v. Oklahoma, 112 S. Ct. 1046, 1061 (1992);  Moats v. United Mineworkers of America Health & Retirement Funds, 981 F.2d 685 (3d Cir. 1992).

## ANALYSIS

The PFDA argues that the FTC has imposed on itself a five-part test, each part of which must be satisfied in order to promulgate a regulation rule.[6]  In turn, the PFDA wants this

_____

[6]The five-part test includes:  (1) a statement as to the prevalence of the practice the FTC seeks to regulate;  (2) a finding or conclusion that the practice causes substantial consumer injury;  (3) a finding or conclusion that the rule or regulation would reduce such consumer injury;  (4) a finding or conclusion that the benefits to be derived from the rule or regulation outweigh the costs imposed by the rule or regulation; and, (5)  a finding or conclusion that consumers cannot reasonably avoid the injury that the practice causes. Ophthalmic Practice Rules, 54 Fed. Reg. 10285, 10287, 16 C.F.R. § 456 (1989) (citing American Financial Services Ass'n., 767 F.2d at 971; Rule on Sale of Used Motor Vehicles, Statement of Basis and

court to apply that five-part test in assessing whether the ban on casket handling fees should be affirmed. Nothing in the FTC Act requires a reviewing court to rigidly adhere to this test which the FTC merely suggests to itself as a means of ensuring that its regulation rules are justified. Yet, since the FTC has essentially made findings and conclusions in the context of those five inquiries, the court will use the five-part test as a guide to determine whether the findings are supported by substantial evidence and/or are arbitrary and capricious.

## The FTC's Finding as to the Prevalence of Casket Handling Fees

What the PFDA appears to complain of most is that the FTC did not make an adequate finding as to the prevalence of casket handling fees. The PFDA contends that the FTC finding that "substantial 'casket handling fees' are imposed on consumers by a significant portion of providers wherever third-party casket sellers exist," Funeral Industry Practices; Final Amended Trade Regulation Rule, 59 Fed. Reg. 1592, 1604, 16 C.F.R. § 453 (1994), was based on flawed or insubstantial evidence and is not an adequate statement as to the prevalence of casket handling fees.

However, contrary to what the PFDA asserts -- that methodologically sound quantitative data must show that the practice sought to be regulated occurs with some frequency -- a "finding as to prevalence" requires neither that substantial,

---

Purpose, 49 Fed. Reg. 45692, 45703, 16 C.F.R. § 455 (1984); Credit Practices Rule, Statement of Basis and Purpose, 49 Fed. Reg. 7740, 7742, 16 C.F.R. § 444 (1984); Letter from FTC to Senators Wendell H. Ford and John C. Danforth (Dec. 17, 1980)).

rigorous, quantitative studies be done, nor that the practice occurs in a certain percentage of transactions throughout the country.  In fact, the FTC's Rulemaking and Investigatory Procedures merely require that the FTC make a "statement as to the prevalence of the acts or practices treated by the rule."  Organization Changes in the Commission's Rulemaking and Investigatory Procedures, 46 Fed. Reg. 26284, 26289, 16 C.F.R. §§ 0-5 (1981) (emphasis added).

"Prevalence" has never been strictly defined by the FTC or the courts.  The FTC has stated, though, that a statement as to prevalence (as well as answers to the other four inquiries) will "vary depending on the circumstances of each rulemaking and the characteristics of the industry involved."  Ophthalmic Practice Rules, 54 Fed. Reg. at 10287, 16 C.F.R. § 456 (citing 49 Fed. Reg. 7740, 7742 n.4).  Indeed, "[n]either the statutory language nor the legislative history of the [FTC] Act suggests that in 1975 Congress intended to require the [FTC] to find as a pre-condition to rulemaking that acts or practices to be regulated are prevalent."  Trade Regulation Rule, Mail or Telephone Order Merchandise, 58 Fed. Reg. 49096, 49100 n.61, 16 C.F.R. § 435 (citing 15 U.S.C. section 57a(d)(1)(A);  Joint H.R. and S. Conf. Rep. No. 1408, 93rd Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Admin. News 7764).  Further, even where there is a limited record as to the prevalence of a practice on a nationwide basis or where the data reviewed only relates to a few states, the practice can be found to be prevalent enough to warrant a regulation.  Trade Regulation Rule;  Credit Practices,

49 Fed. Reg. at 7752, 16 C.F.R. § 444, affirmed by American Financial Services Ass'n., 767 F.2d 957 (limited record evidence existed with respect to the prevalence of the practice; evidence showed that practice occurred in just a few states and only in a small percentage of transactions, but despite the inability to precisely quantify the evidence, the FTC found that the practice was probably more widespread than the data indicated and at any rate was prevalent enough to warrant promulgating a regulation rule);  see also Amendment to Trade Regulation Rule Concerning Care Labeling of Textile Wearing Apparel and Certain Piece Goods, 48 Fed. Reg. 22733, 22743, 16 C.F.R. § 423 (1983) (record did not permit a determination of how widespread the practice was, just that it did occur and FTC adopted amendment). Additionally, studies upon which a finding as to prevalence is based need not be projected to the entire nation where the practice is limited, prohibited, or regulated in many areas anyway by state law. Trade Regulation Rule;  Credit Practices, 49 Fed. Reg. at 7752, 16 C.F.R. § 444, affirmed by American Financial Services Ass'n., 767 F.2d 957 (because practice sought to be regulated was forbidden by state law in many areas, practice did not need to occur throughout nation in order to be subject to regulation). Overall, then, there appears to be no mandate that a practice be prevalent (i.e., occur in a certain number of transactions) in order for the FTC to adopt a rule regulating the practice.  See Mail Order or Telephone Merchandise Rule, 58 Fed. Reg. 49096, 49100 n.61, 16 C.F.R. § 435 (1993);  Trade Regulation Rule; Credit Practices, 49 Fed. Reg. at 7753, 7757, 16 C.F.R. § 444.

Taking all of this into account, the FTC's finding as to the prevalence of casket handling fees is supported by substantial evidence in the rulemaking record taken as a whole. First, the FTC noted that third party casket sellers only number approximately 150-200 in the whole United States.[7] Additionally, those sellers are concentrated primarily in three states -- Pennsylvania, Ohio and Michigan -- because many states prohibit anyone but a licensed funeral service provider from selling caskets. Since casket sales by third parties is prohibited in most areas by state law, most funeral service providers have no need to impose casket handling fees. Therefore, the practice of charging casket handling fees could not be widespread nationwide. See Trade Regulation Rule; Credit Practices, 49 Fed. Reg. at 7752, 16 C.F.R. § 444.

Second, the FTC relied on several things in making its finding as to prevalence:[8] a study done by the Pre-Arrangement Association ("PAA"); corroborative testimony and statements by other witnesses; and other surveys of casket handling fees in local markets. The FTC admits that the PAA study was not the most statistically rigorous or comprehensive survey. However, conducting or relying on statistically rigorous and comprehensive

---

[7]The small number of documented third party casket sellers is probably due, in part, to the fact that third party casket sellers were literally non-existent prior to the 1982 implementation of the original Funeral Rule.

[8]The PFDA argues that the FTC relied exclusively on the Pre-Arrangement Association study, which the PFDA argues was not statistically rigorous and was conducted in a biassed manner.

studies is not necessary in making a finding as to prevalence. See Mail Order or Telephone Merchandise Rule, 58 Fed. Reg. at 49108, 49109, 16 C.F.R. § 435; Trade Regulation Rule; Credit Practices, 49 Fed. Reg. at 7742, 16 C.F.R. § 444. Nevertheless, the court does recognize that some basis or evidence must exist to suggest that the practice the FTC rule seeks to regulate does indeed occur, and, with respect to the incidence of casket handling fees, substantial evidence supports a finding that the practice exists.[9]

The PAA evaluated 31 responses from third party casket sellers to a survey about whether casket handling fees are imposed. All 31 respondents said that casket handling fees were

[9]The PFDA, in addition to attacking the results of the PAA study, complains that the survey itself was conducted in a biassed manner. So, not only were the results on their face woefully inadequate -- according to the PFDA -- to support a finding as to prevalence, but the results may even have been skewed. The PFDA asserts that because a cover letter that accompanied the PAA survey stated that the results would be used "to present to the FTC testimony on the impact that casket handling fees have had on the third party sale of funeral merchandise," Letter from Dayne Sieling, Executive Director of the PAA to Members of all State Cemetery Associations dated October 12, 1988, the survey itself was injected with bias.

While not claiming to be experts on statistical analysis, the court finds that the cover letter did not infect the PAA study so as to render it unusable or unreliable. For example, the cover letter did not state that the PAA would use the survey to get the FTC to ban casket handling fees, and, without responses indicating that such fees are imposed, the ban would never occur. Rather, the cover letter just stated that the issue of casket handling fees would be addressed at upcoming FTC hearings. Moreover, the FTC reviewed the PAA survey before it was distributed in order to ensure that it was valid. Therefore, the court rejects the PFDA's argument that the cover letters sent with the PAA survey so infected the survey with bias that it was arbitrary and capricious for the FTC to rely on it.

imposed in their market areas.  Eighty-six percent of respondents said that at least 60% of the funeral homes in their market areas assessed such fees;  66% indicated that the fees were imposed by at least 80% of the funeral homes;  48% of respondents stated that at least 90% of the funeral homes in their areas assessed casket handling fees;  and 24% of respondents indicated that 100% of the funeral homes in their market area used such a fee. Testimony of Duke Radovich.

Additionally, most of the witnesses who testified at the rulemaking hearings indicated that where third party casket sellers exist, a significant number of funeral service providers imposed casket handling fees.  The other informal surveys the FTC relied on were surveys conducted by a journalist, by a third party casket seller, who surveyed funeral homes, and a third done by asking funeral customers questions.  Once again, all of these "studies" indicated that where third party casket sellers exist, substantial casket handling fees are imposed by funeral service providers.  In fact, the results showed that many customers of the third party casket sellers ended up canceling their third party contracts to avoid paying more overall than if they had purchased their casket at the funeral home.  This corroborative testimony and anecdotal evidence buttresses the FTC's finding as to the prevalence of casket handling fees.

Finally, the study that the PFDA would like the FTC and this court to rely on (exclusively) -- funeral transaction records collected by the Federated Funeral Directors of America ("FFDA") -- is not entirely applicable because that study

indicated that a very small percentage of funeral service transactions involve a casket handling fee (0.05%). This result occurred for probably two reasons. First, the survey sampled funeral transactions throughout the country. As stated above, third party casket sellers are concentrated in only a few areas and a survey of the entire nation would obscure the prevalence of the fees in the areas where third party casket sellers exist. Second, the FFDA transaction sheets that were evaluated did not specifically ask about casket handling fees. Rather, the transaction sheets merely asked for an itemized price list of what was charged to a customer. Because it is apparent that many funeral service providers convince customers to cancel their third party contracts and buy the casket from the funeral director, a fee would not appear on a final bill. Moreover, because casket handling fees are not really a good or a service, they might not show up as a separate item on a final bill. Therefore, the FTC did not act arbitrarily in declining to rely solely on the FFDA study.

Overall, the PAA study, the informal surveys, the testimony, and the anecdotal evidence all indicate that where third party caskets are sold, a significant number of funeral homes impose casket handling fees. The PFDA does not contest this conclusion, but merely argues that the FTC did not rely on statistically sound studies and that the practice does not occur often enough throughout the country to justify a ban on the practice. Therefore, the FTC's finding as to the prevalence of

casket handling fees was supported by substantial evidence in the rulemaking record taken as a whole.

<u>Whether Casket Handling Fees Cause Substantial Consumer Injury</u>

The FTC concluded that since the casket handling fees are non-declinable and are tied to the purchase of a casket, they frustrate the underlying principle of the original Funeral Rule's anti-bundling provisions. Funeral Industry Practices; Final Amended Trade Regulation Rule, 59 Fed. Reg. 1592, 1604, 16 C.F.R. § 453. Therefore, the consumer is injured in that the right to decline to purchase any item, including a casket, from a funeral service provider "is illusory if funeral providers can condition consumers' choice on the payment of an additional, non-declinable fee." <u>Id</u>. at 1604. Further, consumer choice is restricted because the casket handling fee operates as a penalty for exercising that choice.

At the outset, the court notes that the original Funeral Rule's regulations were enacted, in large part, to eliminate bundling. The FTC concluded with respect to the original Funeral Rule, and the Fourth Circuit agreed, that bundling, or forcing a customer to pay for any item aside from the one non-declinable professional service fee, injured consumers. With respect to the amendment at issue here, the FTC concluded that casket handling fees constitute bundling insofar as they are unfair conditions on a customer's right to decline an unwanted item.[10] That conclusion was neither arbitrary nor

---

[10] For example, funeral service providers essentially say, "either buy your casket here, or we'll charge you for it anyway."

capricious since bundling speaks of forcing consumers to pay for items or services that they do not want. Therefore, as discussed above, the court will consider that the Fourth Circuit has already determined that bundling causes consumers substantial injury as part of the analysis of whether the FTC's conclusion that casket handling fees cause substantial consumer injury is supported by substantial evidence.

The PFDA argues that because a casket handling fee is only imposed to make sure that those customers buying caskets from third parties pay their fair share of the funeral home's overhead costs, no consumer injury occurs. That argument is interesting because the PFDA further argues that if no casket handling fee is imposed, the customers who do buy their caskets from the funeral home will be penalized by having to subsidize the ones who purchase caskets elsewhere. But blaming or penalizing the consumer who had the wherewithal to purchase a less expensive casket ahead of time from a third party is unfair since who pays what to whom is merely a function of how the funeral director chooses to recoup his or her overhead costs. In other words, the funeral director does not need to use the mark-up on a casket to recoup those costs, especially knowing that some casket sales may be lost to third parties; that is what the non-declinable service fee is for. Every consumer using a funeral home "uses" the overhead of the funeral director. Yet, because funeral service directors are unwilling to redistribute costs and recoup overhead through the one fee they are permitted to charge everyone, some consumers are penalized for exercising

choice in purchasing caskets. Those consumers are forced to pay for something they do not want -- the mark-up on the funeral home's casket which the consumer did not even buy.

Another indication that the casket handling fee is a penalty is that no extra labor, liability, time, or other cost is involved in "handling" a third party casket. <u>See</u> Testimony of Wendell Hahn. If customers who purchase a third party casket are not "costing" the funeral homes anything extra, there really is no justification for charging them a several-hundred dollar fee other than to penalize them for not buying a casket from the funeral home.

Additionally, funeral homes do not charge such handling fees for ship-ins. Even though the families of these deceased have caused the funeral home to lose a sale on a casket, and even though the families of these deceased are not "paying their fair share of the funeral home's overhead costs," they are not charged casket handling fees. This shows that only those consumers who make a conscious choice to purchase a casket from a third party pay this fee.

Such a fee can only be described as a penalty for exercising choice in purchasing a good and as a method of forcing consumers to purchase a casket from a funeral home, or at least pay the funeral home the mark-up on a casket so that the consumer may as well have bought it from the funeral home. This constitutes substantial consumer injury, especially in light of the FTC's finding, sustained by the Fourth Circuit, that bundling injures consumers. Therefore, the FTC's conclusion that casket

handling fees cause substantial consumer injury is supported by

substantial evidence and was not arbitrary or capricious.

The FTC's Conclusion that a Ban on Casket Handling Fees Will
Reduce Such Consumer Injury

The FTC implicitly found that a ban on casket handling

fees would reduce consumer injury.  The PFDA argues that the ban

will not reduce consumer injury because funeral service providers

can circumvent the ban by creating packages, all of which include

caskets, and offering discounts on those packages.  Since only

those people buying a casket from the funeral home would get such

a discount, the person who buys a third party casket would be

paying an indirect fee.  Thus, according to the PFDA, the

consumer injury still exists.

On the other hand, the FTC distinguishes direct casket

handling fees from offering discounts to people who buy caskets

from the funeral home.  The former is an anti-competitive penalty

(the fee) and the latter is a method used to deal with

competition from third party casket sellers which is pro-

competitive.  The fee essentially requires consumers to buy their

caskets from funeral homes, or pay for it anyway.  The other

methods (e.g., discounts) represent a way to encourage consumers

to buy their caskets from funeral homes.

As the FTC points out, the purpose of the ban is not to

prevent funeral service providers from recouping overhead costs

or making a profit.  Rather, the purpose is to encourage

consumers to exercise choice in the marketplace, especially with

the entrance of third party competitors, and to prevent funeral

homes from effectively prohibiting that choice. The injury the casket handling fees cause is not measured in terms of dollar amounts the consumer pays, but in terms of prohibiting the customer from choosing where he or she buys a casket. Therefore, the fact that people who buy caskets from third parties may end up realizing a smaller savings as a result of not obtaining a discount at the funeral home does not mean that they are still being injured.

While the "circumvention" methods of avoiding the ban on casket handling fees does appear to weaken the FTC's position, it does not destroy it. First, it is evident that the FTC considered this issue and determined that it was not a significant enough factor to abandon the amendment. Second, although it does seem that customers who buy their caskets from third parties still may end up paying some sort of indirect fee as a result of exercising that choice, a likelihood exists that funeral homes will simply restructure their prices such that the overhead and profits are recouped somewhere other than in the mark-up on a casket. Moreover, the discounting method is not anti-competitive like the direct casket handling fee. For all of these reasons, the FTC's conclusion that the ban on casket handling fees will reduce consumer injury is supported by substantial evidence and is not arbitrary or capricious.

<u>The FTC's Conclusion that the Benefits to be Derived from the Ban Outweigh the Costs</u>

There are several benefits to be realized by the ban on casket handling fees. Consumers will have increased choice in

the purchase of caskets.  Consumers will not be penalized for exercising that choice. Additionally, competition in the market for caskets can be expected to increase with the ban in effect, given the fact that many third party casket sellers went out of business as a result of casket handling fees.  Increasing competition in the casket market is likely to drive the cost of caskets down.  All consumers will benefit from this result.

The FTC recognized some costs which will probably be incurred by this ban.  Since funeral service providers who now charge a casket handling fee will have to restructure their prices, the most significant cost is that many funeral service providers will probably raise the amount of their non-declinable professional service fees in order to ensure that they recoup overhead costs.  Therefore, every consumer may end up paying a little bit more for that fee in the short run.  However, the FTC concluded that the long-term effect of the ban will be increased competition in the casket market such that prices will eventually go down and all consumers will pay less.  Additionally, the FTC found the cost to the funeral industry of having to restructure their pricing methods in order to recoup overhead costs and make profits was insignificant, especially in light of the fact that the funeral service industry presented <u>no</u> evidence regarding the costs it might incur in restructuring its pricing scheme.

The PFDA's main contention with the FTC's cost-benefit analysis is that it is not tied to any quantitative data.  However, quantitative data is not necessary in such an evaluation.  <u>See</u> Mail Order Rule, 58 Fed. Reg. at 49108, 49109,

16 C.F.R. § 435; American Financial Services, 767 F.2d at 986. Additionally, much of a cost-benefit analysis requires predictions and speculation, in any context. An absence of quantitative data here is not fatal to the FTC's analysis.

Finally, the PFDA asserts that the FTC's conclusion that the ban on casket handling fees will result in more competitive prices was flawed. The PFDA argues that since the original Funeral Rule has not resulted in increased competition, neither will this amendment. However, evidence showed that while casket fees had risen in the years since the Funeral Rule went into effect, the retail price had increased less than the wholesale price charged to funeral homes by distributors. It appears, then, that funeral service providers are responding as expected to the Funeral Rule by not raising retail prices on caskets to reflect the rise of wholesale prices; since prices have not risen as much as they could have to retain the same profit margin, prices have, in effect, been lowered.

Additionally, the advent of the casket handling fee as a method of dealing with competition has precluded much true competition from third parties which would ordinarily result in prices charged being driven down. Therefore, overall, the FTC's cost-benefit analysis, which lead the FTC to conclude that the benefits of the ban on casket handling fees outweigh the costs, was supported by substantial evidence and was neither arbitrary nor capricious.

The FTC's Conclusion that Consumers Cannot Reasonably Avoid the Injury Caused by Casket Handling Fees

The final prong of the five-part test involves whether consumers can reasonably avoid the injury caused by casket handling fees, thereby making the ban unnecessary. The consumer injury is the restriction of choice when it comes to buying a casket and the fact that a penalty is imposed when a consumer exercises that choice in favor of a third party casket seller, but against a funeral home. The PFDA argues that since there are no consumer complaints in the record, consumers are obviously avoiding the injury, or do not consider themselves "injured" by the fee.[11]

However, this argument is premised on the assumption that consumers who wish to avoid the fee can shop around to find a funeral provider who does not charge such a fee. That is a faulty assumption. The reason the FTC promulgated the original Funeral Rule was because of the particular vulnerability of funeral service consumers. Funeral consumers are forced to make many of the choices involved in arranging a funeral in a bereaved state and often do not have time to "shop around" at the time of death of a loved one. Consequently, those consumers are in no position to seek out a funeral service provider who will not charge them a casket handling fee, if one even exists in their immediate geographic area.

---

[11]The PFDA also argues that market forces will keep the amount of casket handling fees down such that consumers can avoid injury. This argument is irrelevant given that the FTC does not define the consumer injury by the <u>amount</u> of the casket handling fee, but rather as the <u>fact</u> that such a fee is imposed.

Further, the studies discussed above show that where third party casket sellers exist, a significant number of funeral service providers charge casket handling fees. This indicates that most consumers who wish to and do purchase third party caskets will pay a fee for exercising that choice. If the consumer cannot or will not pay the fee, he or she is forced to buy the casket from the funeral home. That is no choice. Therefore, the injury, as defined by the FTC -- restriction on choice and being penalized for exercising that choice -- cannot be avoided by consumers. The FTC's conclusion as to the unavoidability of the injury is supported by substantial evidence and is not arbitrary or capricious.

## CONCLUSION

After careful review of the entire record, it appears that none of the conclusions the FTC reached was arbitrary or capricious or unsupported by substantial evidence in the rulemaking record taken as a whole. Therefore, for all of the reasons stated above, the petition for review will be denied.