Nathaniel CRAIGMILES; Tommy Wilson; Craigmiles Wilson Casket Supply; Angela Brent; Jerry Harwood; and Naenia Enterprises, LLC d/b/a the Casket Store, Plaintiffs,

v.

Arthur GILES, in his official capacity as Executive Director of the Tennessee Board of Funeral Directors and Embalmers; Larry Meriwether, Sr., Fred S. Wheeler, Lori Keen, Edward Larson, Charles B. Manes, Karen House, and Mack Wood, in their official capacities as Members of the Tennessee Board of Funeral Directors and Embalmers; Paul G. Summers, in his official capacity as Attorney General of the State of Tennessee; and John Hopkins, in his official capacity as the Director of Investigations for the Division of Regulatory Boards of the Department of Commerce and Insurance, Defendants.

No. 1:99-CV-304.

United States District Court,
E.D. Tennessee,
at Chattanooga.

Aug. 21, 2000.

Harold L North, Jr, Shumacker & Thompson, Chattanooga, TN, William H Mellor, Miranda Perry, Institute for Justice, Washington, DC, for Nathaniel Craigmiles, Tommy Wilson, Craigmiles Wilson Casket Supply, Angela Brent, Jerry Harwood, Naenia Enterprises, LLC dba The Casket Store, plaintiffs.

Steven A Hart, Janet M Kleinfelter, Office of the Attorney General and Reporter, Civil Litigation/State Services Division, Nashville, TN, for Arthur Giles, Robert Gribble, William Powell, Lori Keen, Edward Larson, Richard Tetrick, Karen House, Mack Woods, Paul G Summers, John Hopkins, defendants.

## MEMORANDUM OPINION

EDGAR, Chief Judge.

### I.

This is a civil rights lawsuit brought pursuant to the Fourteenth Amendment to the United States Constitution; the Civil Rights Act of 1871; 42 U.S.C. § 1983; and the Declaratory Judgments Act, 28 U.S.C. §§ 3331 - 3343. Plaintiffs Reverend Nathaniel Craigmiles, Tommy Wilson, Angela Brent, and Jerry Harwood seek to operate retail casket stores in Tennessee. Craigmiles and Wilson are partners in Craigmiles Wilson Casket Supply. Brent and Harwood are members of Naenia Enterprises, LLC d/b/a The Casket Store. The defendants are all Tennessee state officials sued in their official capacities. Plaintiffs challenge the constitutionality of the portion of the Tennessee Funeral Directors and Embalmers Act (the "FDEA" or "Act"), TENN. CODE ANN. §§ 62-5-101 - 62-5-611, that requires any person who sells "funeral merchandise" to hold a funeral director's license issued by the State of Tennessee.

Certain parts of the FDEA bear directly on the plaintiffs' ability to conduct their businesses. Specifically, only licensed funeral directors may lawfully engage in "funeral directing." TENN. CODE ANN. § 62-5-303. "Funeral directing" is defined to include, among other things, "Making of arrangements to provide for funeral services and/or the selling of funeral merchandise, and/or the making of financial arrangements for the rendering of the services, and/or the sale of such merchandise;" TENN. CODE ANN. § 62-5-101(3)(A)(ii). Businesses which engage in

"funeral directing" must have a licensed funeral director in charge. TENN. CODE ANN. § 62-5-313. A violation of the FDEA is a misdemeanor. TENN. CODE ANN. § 62-5-103. None of the individual plaintiffs holds a Tennessee funeral directors license. Neither of the business plaintiffs is operated by a licensed funeral director.

## II.

Plaintiff Craigmiles is an ordained minister who serves the Marble Top Missionary Church in Chattanooga, Tennessee. He and his partner, plaintiff Tommy Wilson, opened the Craigmiles Wilson Casket Supply Store in Chattanooga in March 1999. They invested approximately $30,000 in the business and were open approximately four months during which the store sold steel caskets priced between $495 and $985. In July 1999, Arthur J. Giles, Executive Director of the Tennessee Funeral Board and Burial Services, ordered Craigmiles cease and desist "all sales of caskets and any other funeral merchandise" until he had a license issued by the Board of Funeral Directors and Embalmers. Craigmiles and Wilson have ceased operating their store.

Plaintiff Angela Brent went into business with her father, Jerry Harwood, opening "The Casket Store" in Knoxville, Tennessee, on May 3, 1999. Their purpose was to sell caskets, urns (for cremated remains), and related items such as monuments, grave markers, roadside crosses, stationery, rosaries, guest books, pet urns and caskets, and pet markers. Mr. Giles sent these plaintiffs a "cease and desist" letter on May 10, 1999. Since that time, Mrs. Brent and her father have been prevented by state law from selling caskets and urns from their Knoxville store. They have continued to operate their store, selling the other items, though the store operates at a loss. They paid $42,500 to a Canadian company for a casket franchise.

## III.

The FDEA and its implementing regulations, Tenn. Comp. R. & Regs. chs. 0660-1 - 0660-10, regulate the funeral and embalming industry in Tennessee. The Act establishes a seven-member board, the Board of Funeral Directors and Embalmers ("Funeral Board") which is charged with administering the Act. The Funeral Board is comprised of six licensed funeral directors and one individual from outside the funeral industry. TENN. CODE ANN. § 62-5-201.

To become a licensed funeral director in Tennessee, persons have two options. They can complete a course of study at a school for funeral directors approved by the Funeral Board, and undergo a one-year apprenticeship; or, they can do a two-year apprenticeship ("practical training and experience") and assist in at least 25 funerals. TENN. CODE ANN. § 62-5-305(a)(6). The only Tennessee school approved by the Funeral Board is Gupton College, which is located in Nashville. The courses of study offered at Gupton College last either 12 or 16 months. The 16-month course, which is the most popular, costs between $10,000 and $12,000 in tuition and other expenses. License applicants who attend Gupton College must embalm dead bodies. In addition, to obtain a license, an applicant must pass an examination on subjects determined by the Funeral Board. If the Funeral Board finds:

> Upon examination that the applicant has a reasonable knowledge of sanitation and disinfection of premises, clothing, bedding, and other articles subject to contagion and infection, and has a reasonable knowledge of the sanitation and disinfection of bodies of deceased persons where death was caused by infectious diseases or communicable diseases, and has all the requirements and qualifications herein stated, and has complied with all the rules and regulations of the board applying to funeral directors, the board shall, upon receipt of a fee as set by the board, issue to the applicant a license to practice funeral directing.

TENN. CODE ANN. § 62-5-306(c).[1]

In 1972, the Tennessee Legislature expanded the definition of "funeral directing" to include the "making of arrangements to provide for funeral services and/or the selling of funeral merchandise, and/or the making of financial arrangements for the rendering of the services, and/or the sale of such merchandise ..." TENN. CODE ANN. § 62-5-101(3)(A)(ii). The Act does not specifically define "funeral merchandise." However, TENN. CODE ANN. § 62-5-104 indicates that the term includes "receptacles and containers used for burial, entombment, or other final disposition of a dead human body or the remains thereof." Since, under the FDEA, the plaintiffs, by selling caskets and urns to the public, are engaged in "funeral directing," the State requires them to meet all applicable requirements and obtain a state funeral director's license.

## IV.

Plaintiffs assert that the FDEA, as applied to them, violates the Fourteenth Amendment to the United States Constitution. Section 1 of the Fourteenth Amendment provides:

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction equal protection of the laws.

Specifically, plaintiffs allege that the portion of the FDEA which requires them to obtain a license to sell caskets and urns violates their rights under the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment.

### Substantive Due Process

By virtue of the Due Process Clause, the State may not "deprive any person of life, liberty, or property without due process of law..." "The touchstone of due process is protection of the individual against arbitrary action of the government." *County of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The Fourteenth Amendment's due process guarantee includes more than just procedural fairness. *Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194, 197, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979); *Kelley v. Johnson*, 425 U.S. 238, 244, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). The amendment also prohibits the government from imposing impermissible substantive restrictions on individual liberty. *Washington v. Glucksburg*, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1994); *Harrah Indep. Sch. Dist.*, 440 U.S. at 197, 99 S.Ct. 1062.

Plaintiffs indisputably have a liberty interest in the right to pursue their chosen occupation. *Conn v. Gabbert*, 526 U.S. 286, 291-92, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Wilkerson v. Johnson*, 699 F.2d 325, 328 (6th Cir.1983). This right is, however, subject to reasonable regulation by the State of Tennessee. *Conn*, 526 U.S. at 292, 119 S.Ct. 1292; *Washington*, 521 U.S. at 728, 117 S.Ct. 2258; *Dillinger v. Schweiker*, 762 F.2d 506, 508 (6th Cir.1985) (equal protection case). *See also Nebbia v. Peopl of New York*, 291 U.S. 502, 528-29, 54 S.Ct. 505, 78 L.Ed. 940 (1933) ("The

---

1. Applicants attending school may take either an exam given nationally and administered by the International Conference of Funeral Service Examining Boards or a Tennessee examination. Two-year apprentices are required to take the Tennessee examination. A small percentage of the questions in these examinations concerns the construction of caskets, urns and burial vaults; materials used in these items; and their merchandising.

right to conduct a business, or to pursue a calling, may be conditioned."). Such regulation must be "rationally related to legitimate government interests." *Washington,* 521 U.S. at 728, 117 S.Ct. 2258.

■ Thus, when confronted with an economic regulation, the Court must ascertain whether it has a rational basis. The rational basis test has two components: (1) the state legislation must have a legitimate government purpose; and (2) there must be a rational relationship between that purpose and the means chosen by the State to achieve it. *Washington,* 521 U.S. 702 at 728, 117 S.Ct. 2258; *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 125, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *see also Romer v. Evans,* 517 U.S. 620, 631-633, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (equal protection case); *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (equal protection case).

■ The State has advanced two purposes for the requirement that only licensed funeral directors may sell funeral merchandise. The first such purpose is "protecting the vulnerable funeral consumer and insuring competency in the funeral services profession." The second is to "protect the public health, safety and welfare of the public." These are clearly legitimate governmental interests. *City of Erie v. Pap's AM,* 529 U.S. 277, 120 S.Ct. 1382, 1395, 146 L.Ed.2d 265 (2000) (health and safety); *Turner Broad. Sys. v. Federal Communications Commission,* 520 U.S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (consumer protection); *Schenck v. Pro–Choice Network of Western New York,* 519 U.S. 357, 375-76, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (health and safety); *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 502, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (consumer protection); *Reno v. Flores,* 507 U.S. 292, 304, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (health and safety); *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 300, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (health and

safety). However, the mere assertion of a legitimate government interest has never been enough to validate a law. The Court must evaluate the relationship between the law and the stated purpose thereof. *See, e.g., Lochner v. New York,* 198 U.S. 45, 57, 25 S.Ct. 539, 49 L.Ed. 937 (1905), *overruled in part, Day-Brite Lighting, Inc. v. State of Missouri,* 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 (1952); *see also Coppage v. Kansas,* 236 U.S. 1, 15, 35 S.Ct. 240, 59 L.Ed. 441 (1915), *overruled in part by Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

■ The key issue in this case is whether the funeral merchandise sales licensure requirement is a rational means of achieving these purposes. This Court holds that it is not. The requirement certainly has nothing to do with public health and safety. A casket is nothing more than a container for human remains. Caskets are normally constructed of metal or wood, but can be made of other materials. Some have "protective seals," but those seals do not prevent air and bacteria from exiting. All caskets leak sooner or later, and all caskets, like their contents, eventually decompose. In those rare instances where human remains (before burial) might present a public health concern, funeral directors do not rely on caskets to negate the threat. Instead, they rely on embalming, adjustments to the funeral arrangements, and other techniques such as the use of plastic encasements for the body. The record contains no evidence that anyone has ever been harmed by a leaky casket. The record contains no evidence that a leaky casket has harmed the environment in any way.

The evidence also shows that Tennessee does not really believe that caskets play any role in the promotion of public health and safety. The State does not require the use of a casket in human burials. Customers can choose any casket they desire, snug or airy, despite the views of the funeral director and regardless of the cause of the deceased's death. Moreover,

the Federal Trade Commission ("FTC") requires funeral directors to accept caskets provided by third parties. 16 C.F.R. § 453.4(b)(1). Caskets can be purchased via the Internet. A former Governor of Tennessee, Ray Blanton, was buried in a casket that an acquaintance built for him.

Caskets, whether purchased from a funeral director or from an independent retailer, are not intended to prevent the spread of communicable diseases. The essential elements of casket construction do not differ between caskets sold by funeral directors and those sold elsewhere. Such being the case, the purpose of promoting public health and safety is not served by requiring two years of training to sell a box. Moreover, none of the training received by licensed funeral directors regarding caskets has anything to do with public health or safety. The training and the exam questions regarding caskets relate only to product information and merchandising. These topics have no relationship to health and safety, but might be helpful to one who sells any product. In sum, a casket does not differ from any other product in the marketplace. No health and safety reason rationally relates to requiring an individual to undergo two years of training, pay a fee, and pass a test in order to sell a casket.

Similarly, the use of an urn for cremated remains has no connection with health and safety. Urns can be made of almost anything. They hold human bone fragments and powder that is a result of a body having been placed in a machine an incinerated at a temperature of 1600 degrees. One's "ashes" can be scattered, buried, or left in an urn and placed on the mantel or in a fisherman's tackle box. An urn plays no role in protecting health, safety, or the environment. The licensing of urn salespersons serves no health and safety purpose.

The State also asserts that the FDEA serves the governmental interest of consumer protection. This purpose is legitimate. However, the evidence clearly shows that the state licensure requirements do not benefit the consumer.

A primary consumer benefit advanced by the State relies upon the FTC's Funeral Rule. 16 C.F.R. §§ 453.1 - 453.4. Because the funeral Board has incorporated the FTC's Funeral Rule into the requirements for funeral directors, Tenn. R. & Regs. ch. 0660-6.01 - .05, Tennessee funeral directors must provide prospective casket purchasers with price lists upon request.[2] Independent retailers are not bound by that rule. The State asserts that this requirement protects the public.

It should first be noted that the Tennessee Legislature could not have considered the Funeral Rule when in 1972 it made funeral directors the sole source of caskets. The Funeral Rule did not become effective until 1984. The FTC issued the rule to prevent funeral directors from selling preselected packages of goods to consumers so that consumers were forced to purchase goods and services they did not want. *See Pennsylvania Funeral Dirs. Ass'n, Inc. v. Federal Trade Comm'n,* 41 F.3d 81, 83 (3d Cir.1994). Funeral providers were "bundling" the cost of funerals; hence, the need to have these costs separated for consumers.

Moreover, requiring the disclosure of casket costs by independent retailers is unnecessary. The plaintiffs, as independent casket retailers, do not provide funeral services; they only sell caskets, urns, and other funeral-related merchandise. Independent retailers do not need to be compelled to disclose prices. Like any other retailers, if they fail to disclose their prices, they will do no business.

The State also contends that the FDEA's disciplinary procedures protect the consumer. The FDEA provides that

**2.** The Funeral Rule requires funeral services providers to "give a printed or typewritten price list to people who inquire in person about the offerings or prices of caskets or alternative containers." 16 C.F.R. § 453.2(a)(2)(i).

the Funeral Board (comprised of six funeral directors and one non-funeral director) may deny or revoke a license or otherwise discipline a licensee for conviction of a felony or a crime "involving moral turpitude," TENN. CODE ANN. § 62-5-317(a)(2); engaging in "immoral or unprofessional conduct," TENN. CODE ANN. § 62-5-317(a)(4); "Misrepresentation or fraud in the conduct of the business of the funeral establishment," TENN. CODE ANN. § 62-5-317(b)(1); or for "False or misleading advertising," TENN. CODE ANN. § 62-5-317(b)(2). The State points out the sales are generally made when a family has suffered the loss of a loved one; may be in some stage of grief; and, according to the State, are therefore susceptible to pressure sales tactics.

There is no evidence, however, that consumers would be treated any differently by independent retailers than by funeral directors. Funeral directors are given no training on how to deal with grief. The State has pointed to no instance where any funeral director has been disciplined in connection with the sale of funeral merchandise. Moreover, the consumer who purchases from an independent retailer is not without remedies. Consumers have the general contract and tort remedies available under state law, supplemented by the Tennessee Consumer Protection Act, TENN. CODE ANN. §§ 47-18-101 - 47-18-5002, which provides relief to consumers for a wide array of unfair or deceptive acts or practices.

The State also contends that funeral directors are better able to provide a consumer with warranty information about caskets.[3] But these warranties are issued by the casket manufacturers, which makes the seller's identity irrelevant to the availability of this "consumer protection." If something should happen to damage the casket before it is buried, there is no reason to believe that a customer who wants a replacement casket could not get one from an independent retailer.

The State also argues that consumers are protected by requiring a casket seller to obtain a funeral director's license because funeral directors can better inform customers of their specific casket needs. However, the only example the State could give of a specific need was the requirement of Orthodox Judaism that caskets be all-wood. Nothing in the record suggests that any Orthodox Jew has ever needed a funeral director's advice on this requirement. Moreover, the evidence shows that if an Orthodox Jewish customer wants to purchase a non-wood casket, the funeral director has no right to refuse. It is irrational to require casket sellers to obtain funeral directors' licenses to "protect" Orthodox Jewish consumers from making a choice that is rightfully theirs to make.

Caskets are often the single most expensive item in the cost of a funeral. Customers deserve to have a choice about where to purchase them. By reducing price competition, the FDEA, far from helping the consumer, hurts the consumer. Indeed, trial testimony in this case reveals that funeral homes markup the price of their caskets from 250% to 400%, perhaps as high as 600%. Whereas the plaintiffs, while operating, used lower markups. Mrs. Brent used 100% markup.[4] Reverend Craigmiles added a flat $350 to his casket cost.

In sum, Tennessee may of course protect public health and consumers. However, the means it has chosen in this instance to accomplish these purposes have no rational basis. The Tennessee Legislature has exercised its power "without any reasonable justification." *County of Sacramento v. Lewis,* 523 U.S. at 846, 118 S.Ct. 1708. Therefore, the provisions of the

---

3. Some caskets come with warranties, which are in themselves somewhat of a joke.

4. Since being put out of business by the State, Mrs. Brent has been trying to sell caskets in

Tennessee as an agent for a Florida concern. Since local funeral directors have disparaged the quality of these caskets, Mrs. Brent is now selling them at less than cost.

FDEA that require an individual to become a licensed funeral director in order to lawfully sell a casket or an urn violate the Due Process Clause of the Fourteenth Amendment.

### Equal Protection

The Equal Protection Clause provides that a State may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Plaintiffs contend that the FDEA provisions regulating the sale of funeral merchandise unconstitutionally treat casket retailers differently from retailers of other consumer goods and identically to funeral directors.

 Since casket retailers are neither a suspect nor quasi-suspect class, the FDEA licensing requirements violate the Equal Protection Clause only if there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Central State Univ. v. American Ass'n of Univ. Professors*, 526 U.S. 124, 127-28, 119 S.Ct. 1162, 143 L.Ed.2d 227 (1999) (quoting *Heller v. Doe*, 509 U.S. 312, 319-20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)); *Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 313-14, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). As a general rule, courts must defer to state legislators in creating statutory classifications for legitimate purposes. However, while rational basis review is deferential, it is not "toothless." *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 532 (6th Cir.1998). The Court's role is to ensure a rationality between the government's stated purpose and its means of executing the same.

The Court's findings made under its substantive due process analysis clearly establish that Tennessee has no rational basis for disadvantaging those who would, as private entrepreneurs, sell caskets and urns to the public. *See Romer*, 517 U.S. at 633, 116 S.Ct. 1620 (explaining rational

basis test). There is no reason to require someone who sells what is essentially a box to undergo the time and expense of training and testing that has nothing to do with the State's asserted goals of consumer protection and health and safety. The FDEA also violates the Fourteenth Amendment's Equal Protection Clause.

### Privileges and Immunities

The Privileges and Immunities Clause of the Fourteenth Amendment provides: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, § 1. The plaintiffs claim that the State has deprived them of their "right to earn an honest living" and has thereby deprived them of one of the "privileges and immunities" of national and state citizenship.

In the *Slaughter-House Cases*, 83 U.S. (16 Wall) 36, 21 L.Ed. 394 (1872), a closely divided Supreme Court upheld a Louisiana statute which granted a monopoly of the slaughtering business in a specified geographical area. Justice Miller, writing for the majority, found that States are only obligated under the Privileges and Immunities Clause to protect certain very limited rights of national citizenship, and does not permit the federal government to protect the citizens of a State against the legislative power of their own State. 83 U.S. (16 Wall) at 74. The effect of the *Slaughter-House* cases was to reduce the Privileges and Immunities Clause to a practical nullity.

It is not for this trial court to breathe new life into the Privileges and Immunities Clause 127 years after its demise. *Stare decisis* requires this Court to reject the plaintiffs' claim that Tennessee has deprived them of a "privilege and immunity" of citizenship. It is worth pointing out,

however, that a number of scholars have provided fresh analysis of the Privileges and Immunities Clause. *See, e.g.,* MICHAEL J. PERRY, THE CONSTITUTION IN THE COURTS: LAW OR POLITICS? (1994); ROBERT H. BORK, THE TEMPTING OF AMERICA: THE POLITICAL SEDUCTION OF THE LAW (1990); WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1988); Kenyon D. Bunch, *The Original Understanding of the Privileges and Immunities Clause: Michael Perry's Justification for Judicial Activism or Robert Bork's Constitutional Inkblot?,* 10 SETON HALL CONST. L.J. 321 (2000); John Harrison, *Reconstructing the Privileges or Immunities Clause,* 101 YALE L.J. 1385 (1992). The Supreme Court has recently grounded a decision on the Privileges and Immunities Clause. *Saenz v. Roe,* 526 U.S. 489, 511, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). A number of scholars, along with Supreme Court Justice Thomas, have suggested that the drafters of the Fourteenth Amendment intended to provide a broader set of rights to state citizens, perhaps like those ascribed by Justice Bushrod Johnson in *Corfield v. Coryell,* 6 F. Cas. 546 (1823) (C.C.E.D. Pa. 1025), to the Privileges and Immunities Clause found in Article IV of the Constitution. *Saenz,* 526 U.S. at 521-528, 119 S.Ct. 1518 (Thomas, J., dissenting).

If faced with the facts of this case, the dissenters in the *Slaughter-House Cases* might well have found that the plaintiffs have suffered an abridgement of their privileges and immunities. Justice Field observed that among the privileges and immunities of state citizens is "the right to pursue a lawful employment in a lawful manner." 83 U.S. (16 Wall) at 97 (Field, J., dissenting). "It is one of the privileges and immunities of every American citizen to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit, without unreasonable regulation or molestation, and without being restricted by those unjust, oppressive, and odious monopolies or exclusive privileges which have been condemned by all free governments." 83 U.S. (16 Wall) at 106 (Field, J., dissenting). Justice Bradley said that "... in my judgment the right of any citizen to follow whatever lawful employment he chooses to adopt (submitting himself to all lawful regulations) is one of his most valuable rights, and one which the legislature of a State cannot invade, whether restrained by its own constitution or not." 83 U.S. (16 Wall) at 113-114 (Bradley, J., dissenting).

Given the historical background of the Fourteenth Amendment as an effort to constitutionalize freedoms enumerated in the Civil Rights of 1866,[5] 14 Stat. 27 (1866), and its commonly expressed legislative intent to nullify the "black codes" which Southern states were adopting to limit the economic rights of the former slaves; the argument of the *Slaughter-House* dissenters may reflect historical truth. Harrison, 101 YALE L.J. at 1388; *see also* Stancey L. Winick, *Comment, A New Chapter in Constitutional Law,* 28 HOFSTRA L. REV. 573, 593 (1999).

5. That statute provided in part as follows:
 That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime where if the party shall have been duly convicted, shall have the same right, in every State and territory in the United States, to make an enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.
 The statute also vests in federal courts the power to enforce it. 14 Stat. 27.

While the result reached by the Court in this case is achieved through conventional substantive due process and equal protection analysis, it may be time, as Justice Thomas suggests in *Saenz*, 526 U.S. at 527-28, 119 S.Ct. 1518, to take another look at the Privileges and Immunities Clause and its place within the Fourteenth Amendment.

## V.

Nothing this Court has said takes away from the basic Tennessee regulatory scheme for the funeral industry. All those statutes and regulations remain intact with certain exceptions. TENN. CODE ANN. § 62-5-101(3)(A)(ii), which defines "funeral directing" to include the selling of funeral merchandise; and TENN. CODE ANN. § 62-5-313, to the extent that requires licensed funeral directors at retail locations which sell funeral merchandise, violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. A **JUDGMENT WILL ENTER** enjoining the defendants from enforcing the FDEA and the Rules of the Tennessee Board of Funeral Directors and Embalmers to prevent the plaintiffs from operating their legitimate retail casket and urn businesses.

### *JUDGMENT*

For the reasons set forth in the accompanying memorandum opinion, it is the **JUDGMENT** of the Court that TENN. CODE ANN. § 62-5-101(3)(A)(ii), which defines "funeral directing" to include the selling of funeral merchandise; and TENN. CODE ANN. § 62-5-313, to the extent that it requires licensed funeral directors at retail locations which sell funeral merchandise, **VIOLATE** the Fourteenth Amendment to the United States Constitution. Defendants and their successors are hereby **ENJOINED** from enforcing the Tennessee Funeral Directors and Embalmers Act and the Rules of the Tennessee Board of Funeral Directors and Embalmers to

prevent the plaintiffs from operating their retail casket and urn sales businesses.

The plaintiffs shall recover their costs of action.

SO ORDERED.