[No. B195664. Second Dist., Div. Three. Dec. 23, 2008.]

MARY L. BAUDINO, Plaintiff and Appellant, v.
SCI CALIFORNIA FUNERAL SERVICES, INC., et al., Defendants and
Respondents.

## COUNSEL

Kiesel Boucher Larson, Paul R. Kiesel, Patrick DeBlase, Michael C. Eyerly; Baron & Budd, Kevin D. McHargue, Sharon D. Bautista and Sean R. Cox for Plaintiff and Appellant.

Haight Brown & Bonesteel, William G. Baumgaertner, Stephen M. Caine; Gurnee & Daniels, Steven H. Gurnee and John A. Mason for Defendants and Respondents.

Jones, Walker, Waechter, Poitevent, Carrére & Denégre, David G. Radlauer; Howrey, Robert E. Gooding, Jr., and Shawn M. Kennedy for Stewart Enterprises, Inc., as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**ALDRICH, J.—**

### I.

### INTRODUCTION

After her father died, plaintiff and appellant Mary L. Baudino (Baudino) obtained funeral goods and services from a mortuary. Thereafter, she filed this lawsuit against the mortuary alleging it did not abide by the Federal Trade Commission's "Funeral Rule," 16 Code of Federal Regulations parts 453.1 to

453.9 (2008), and specifically the "cash advance" provisions of that rule, 16 Code of Federal Regulations parts 453.1(b) and 453.3(f) (2008). After rulings on a motion for summary judgment and a demurrer, the trial court entered judgment against Baudino. We affirm.

II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual background*

The relevant facts are undisputed.

Baudino's father, Manuel Alcarez, passed away on February 7, 2000. On February 8, 2000, Baudino went to defendant and respondent Mirabal Mortuary (Mirabal), a funeral home. Baudino met with funeral counselor Jose Arizmendi.

At Baudino's request, Arizmendi arranged for an open-casket visitation and a funeral mass at a Los Angeles church. Thereafter, Mr. Alcarez's remains were to be cremated, placed into a container, and released to Baudino.

Baudino agreed to pay Mirabal a total of $2,015.89 for goods, services, merchandise, and taxes. Baudino signed a contract, entitled "statement of funeral goods and services selected/purchase agreement." This contract identified all of the choices Baudino had made with regard to her father's funeral. The first page of this three-page agreement contained four sections: I—funeral services and merchandise; funeral director and staff services; II—charges to be incurred by Mirabal on Baudino's behalf; III—other; and IV—tax.

In addition to other goods and services, Baudino agreed to purchase from Mirabal the following four items which are the subject of this appeal: (1) $225 for embalming; (2) $125 for "other preparation"; (3) $225 for transferring remains to the funeral home; and (4) $295 for the casket/cremation, casket item No. 403559. The four items were delineated, along with other items, in section I of the contract.

It is undisputed that (a) these four items were procured by Mirabal from third party vendors; (b) Mirabal charged Baudino more than the wholesale price it had paid for the items; and (c) Mirabal did not disclose these facts to

Baudino. It is also undisputed that Mirabal did not say anything that caused Baudino to believe that the price she was charged for any goods or services identified in section I of the contract was the same price it had paid to the third party vendor. Additionally, Mirabal never described these items as "cash advances."

With regard to the four items in issue: (1) The $225 embalming services were obtained from Snyder Embalming Service; (2) The $125 "other preparation" reflected charges for services such as dressing, casketing, cosmetizing, and otherwise preparing Mr. Alcarez's remains for viewing at the funeral service. These "other preparation" services were performed by Snyder Embalming Service employees; (3) The $225 for transferring the remains reflected transportation services for picking up Mr. Alvarez's remains from the hospital where he had died, and transporting them to Mirabal's service center for preparation and safekeeping. These transportation services, commonly referred to as "first call" services, were performed by East Accommodations, Inc.; and (4) The $295 casket was purchased at wholesale directly from Batesville Casket Company.

Snyder Embalming Service and East Accommodations, Inc., provide services only to the funeral industry and not to members of the general public.

Customers can purchase caskets from a number of sources other than from a licensed funeral establishment. However, Batesville Casket Company only directly sells its caskets to licensed funeral directors operating in licensed funeral establishments. Mirabal kept a model of the casket Baudino purchased in its showroom. Baudino viewed the model prior to making her selection. Mirabal's pricelist, which was given to Baudino, included the price of the casket chosen by Baudino. Mirabal faxed an order to Batesville on February 8, 2002, after the arrangement meeting with Baudino concluded. Batesville typically delivers caskets to funeral homes the day after an order is received.

As agreed, Mirabal arranged for Mr. Alcarez's body to be transported by East Accommodations, Inc., from the hospital to Mirabal's service center where Snyder Embalming Service embalmed and prepared it for viewing.[1] Mirabal employees then transported the casketed remains to a Catholic church where a visitation and funeral mass were held on February 11, 2002. Following the service, Mirabal transported the remains to a crematory where the body was cremated. Thereafter, Mirabal transported the cremated remains back to the mortuary, where Baudino picked them up on March 3, 2002.

---

[1] Mirabal furnished virtually all of the tools and equipment necessary for the embalming, dressing, casketing, and cosmetizing.

Baudino paid Mirabal $2,015.89, as had been agreed. Included within the charges were those items that had been delineated in section II of the contract, identified as "charges to be incurred by us on your behalf." The section II fees were $33 for certified copies of the death certificate, $100 for an honorarium paid to the clergy, and $7 for disposition permits. The charges to Baudino for these items were the same as Mirabal had paid.

## B. *Procedural background*

### 1. *The complaint and Mirabal's summary judgment motion*

Baudino's original complaint was filed on November 3, 2004, for herself and on behalf of a class of similarly situated plaintiffs.[2] The operative complaint is the third amended complaint. It alleges three causes of action: breach of contract; restitution; and violation of the unfair practices law (the UCL, Bus. & Prof. Code, § 17200 et seq.). The essence of the complaint is that Mirabal (defendant and respondent SCI California Funeral Services, Inc., a California corporation doing business as Mirabal Mortuary) violated the "cash advance" provisions of the Funeral Rule with regard to four items: (1) embalming; (2) other preparation; (3) first call transportation services; and (4) the casket. Baudino alleged that Mirabal violated the Funeral Rule by failing to disclose to her price markups on these items.

Mirabal filed a summary judgment motion contending it had complied with the Funeral Rule. Baudino filed a motion for summary adjudication asserting that the Funeral Rule obligated Mirabal to notify her that it had charged her a price higher than it had paid for the four items obtained from the third party vendors.

The trial court granted Mirabal's motion for summary judgment and denied Baudino's motion. Baudino appealed from the subsequently entered summary judgment in favor of Mirabal.

### 2. *The motion to quash and demurrer by the other named defendants*

The complaint also named as defendants four non-California entities related to Mirabal: (1) Service Corporation International; (2) SCI Funeral Services, Inc., an Iowa corporation; (3) SCI Funeral Services, Inc., a Delaware corporation; and (4) SCI Management LP, a Delaware limited partnership. These four entities did not file summary judgment motions because their motions to quash were pending.

---

[2] The lawsuit is filed as a class action. There is no indication in the appellate record that a class has been certified.

After the summary judgment ruling in favor of Mirabal, the trial court granted the motion to quash brought by SCI Funeral Services, Inc., a Delaware corporation. This defendant is not a party to this appeal.

Two of the entities (defendants and respondents Service Corporation International and SCI Funeral Services, Inc., an Iowa corporation) demurred to the third amended complaint arguing that all allegations rested on the Funeral Rule and thus, all issues had been resolved by the previously entered summary judgment. Baudino opposed the demurrer. She also asked for leave to file a fourth amended complaint, arguing that her claims for relief did not rest solely on the Funeral Rule.

The trial court sustained the demurrer without leave to amend and denied Baudino's motion to amend. The parties stipulated that the fourth non-California entity (defendant and respondent SCI Management LP, a Delaware limited partnership) was deemed a party to the previously sustained demurrer. The trial court entered judgment in favor of the two entities that had brought the demurrer and in favor of SCI Management LP, a Delaware limited partnership. Baudino appealed from the judgment entered after the demurrer ruling.

The appeal from the summary judgment and the appeal from the judgment entered after the demurrer was sustained are both before us and raise the identical issue. For simplicity, hereinafter, we refer to all defendants and respondents as Mirabal.[3]

## III.

## ISSUE

The only issue before us is whether Mirabal violated the cash advance provisions of the Funeral Rule. (16 C.F.R. §§ 453.1(b) & 453.3(f) (2008).)

## IV.

## DISCUSSION

### A. *Standard of review*

This appeal comes to us after the trial court granted a summary judgment and sustained a demurrer without leave to amend.

---

[3] We have given permission to Stewart Enterprises, Inc., to file an amicus curiae brief in support of Mirabal.

"Summary judgment is properly granted where there are no triable issues of fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We review the trial court's decision granting a summary judgment de novo. In doing so, we liberally construe all conflicting facts in the light most favorable to the party opposing the motion. [Citations.]" (*Nielsen v. Beck* (2007) 157 Cal.App.4th 1041, 1048 [69 Cal.Rptr.3d 435].)

With regard to a demurrer, "we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose. [Citations.]" (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189]; accord, *SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 82 [76 Cal.Rptr.3d 73].) "If the court sustained the demurrer without leave to amend . . . we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. . . . The plaintiff has the burden of proving that an amendment would cure the defect. [Citation.]" (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].)

The facts pertinent to the issue before us are undisputed. The parties agree that this case involves the legal issue of the interpretation of the "Funeral Rule" (16 C.F.R. §§ 453.1–453.9 (2008)) and specifically the "cash advance" provisions of the rule (16 C.F.R. §§ 453.1(b) & 453.3(f) (2008)). Generally, the interpretation of an administrative rule is subject to de novo review in the same manner as statutes. (*Cal. Drive-in Restaurant Assn. v. Clark* (1943) 22 Cal.2d 287, 292 [140 P.2d 657]; *Westfall v. Swoap* (1976) 58 Cal.App.3d 109, 114 [129 Cal.Rptr. 750].) Thus, we look first to the plain meaning of the regulation and if there is ambiguity we consider the agency's interpretation. (*Lopez v. World Savings & Loan Assn.* (2003) 105 Cal.App.4th 729, 737 [130 Cal.Rptr.2d 42].) In doing so, we give substantial deference to the agency's interpretation of its own regulations, unless the interpretation is plainly erroneous or there are compelling indications that it is wrong. (*Thomas Jefferson Univ. v. Shalala* (1994) 512 U.S. 504, 512 [129 L.Ed.2d 405, 114 S.Ct. 2381]; *E. I. du Pont de Nemours & Co. v. Collins* (1977) 432 U.S. 46, 54–55 [53 L.Ed.2d 100, 97 S.Ct. 2229]; *Clark v. First Union Securities, Inc.* (2007) 153 Cal.App.4th 1595, 1608 [64 Cal.Rptr.3d 313]; *Wards Cove Packing v. National Marine Fisheries* (9th Cir. 2002) 307 F.3d 1214, 1219.)

B. *The Funeral Rule*

Exercising its statutory authority to define with specificity acts or practices that are unfair or deceptive in or affecting commerce (*Harry and Bryant Co. v. F.T.C.* (4th Cir. 1984) 726 F.2d 993, 999), the Federal Trade

Commission (the FTC, or the Commission) conducted an extensive 10-year investigation of the funeral industry. (*Id.* at p. 996.) "The Commission determined that purchasers of funeral services are often unable to make careful, informed decisions regarding funeral transactions. Funerals are extremely expensive, and decisions about funeral planning must be made under tight time pressure during very stressful times. *See Funeral Industry Practices*, 47 [Federal Register] 42,260, 42,265 [to 42,266] (Sept. 24, 1982). The FTC's investigation revealed that funeral consumers are highly vulnerable to unfair and deceptive trade practices, and that many funeral providers were unlawfully taking advantage of their customers." (*Funeral Consumer Alliance, Inc. v. F.T.C.* (D.C. Cir. 2007) 375 U.S. App.D.C. 364, 365 [481 F.3d 860, 861].)

"[T]he evidence showed that funeral service providers often sold only preselected packages of goods and services such that consumers were forced to purchase goods and services they did not want." (*Pennsylvania Funeral Directors Ass'n v. F.T.C.* (3d Cir. 1994) 41 F.3d 81, 83.) The evidence also revealed that funeral providers were "misrepresenting (a) that the law requires embalming, the purchase of a casket for cremation services, or grave liners and burial vaults; (b) the extent to which funeral goods and services have a preservative and protective value; and (c) whether a mark-up is being charged on 'cash advance' items[. Additionally, funeral providers were] [¶] . . . requiring that consumers who wish to arrange for direct cremation services purchase a casket for use in those cremations[,] [¶] . . . embalming the bodies of decedents without obtaining authorization[,] and [¶] . . . refusing to disclose price information over the telephone." (*Harry and Bryant Co. v. F.T.C., supra*, 726 F.2d at p. 997; see also 47 Fed.Reg. 42260 (Sept. 24, 1982).)

"To prevent such practices, the FTC promulgated the 'Funeral Rule' in September 1982. [Citation.]" (*Funeral Consumer Alliance, Inc. v. F.T.C., supra*, 481 F.3d at p. 861, citing 47 Fed.Reg. 42260 (Sept. 24, 1982); see also 16 C.F.R. § 453 (2008); *Harry and Bryant Co. v. F.T.C., supra*, 726 F.2d at p. 996; *SCI Texas Funeral Services, Inc. v. Hijar* (Tex.App. 2007) 214 S.W.3d 148, 151.) The rule became fully effective in 1984. (73 Fed.Reg. 13740, 13741 & fn. 2 (Mar. 14, 2008); 16 C.F.R. § 453 (2008).)

"The Funeral Rule specified that, four years after it took effect, the FTC would initiate a rulemaking amendment proceeding to determine whether the Funeral Rule was operating effectively, whether any amendments to the Funeral Rule were needed, and whether the entire rule should be repealed." (*Pennsylvania Funeral Directors Ass'n v. F.T.C., supra*, 41 F.3d at pp. 83–84.) After extensive review, the FTC amended the rule in 1994. (59 Fed.Reg. 1592 (Jan. 11, 1994); 16 C.F.R. § 453 (2008).)

■ Currently, "[t]he Funeral Rule defines unfair practices in the sale of funeral goods and services and prescribes preventive requirements." (*Harry and Bryant Co. v. F.T.C., supra,* 726 F.2d at p. 999.) "The essential purposes of the Funeral Rule are to ensure that consumers receive information necessary to make informed purchasing decisions, and to lower existing barriers to price competition in the market for funeral goods and services." (73 Fed.Reg. 13740, 13741 (Mar. 14, 2008), fn. omitted.) "It proscribes several fraudulent sales practices and mandates the pre-sale disclosure of prices to consumers." (*National Funeral Services, Inc. v. Rockefeller* (4th Cir. 1989) 870 F.2d 136, 139.)

To cure the perceived ills, the Funeral Rule requires funeral service providers give consumers, at the beginning of funeral planning discussions, a general pricelist (GPL) detailing the retail price of the services and goods sold. The prices of caskets and outer burial containers are also to be disclosed.[4] At the end of the discussion, consumers are to be given a final statement of goods and services. Further, prices must be revealed when consumers make telephone inquiries. (*Pennsylvania Funeral Directors Ass'n v. F.T.C., supra,* 41 F.3d at p. 83; *Harry and Bryant Co. v. F.T.C., supra,* 726 F.2d at pp. 999–1000.) Additionally, funeral service providers are prohibited from bundling pricing packages, requiring the purchase of a casket for direct cremations, "conditioning the purchase of funeral goods or services on the purchase of any other goods or services" (*Pennsylvania Funeral Directors Ass'n v. F.T.C., supra,* at p. 83; see *Harry and Bryant Co. v. F.T.C., supra,* at pp. 999–1000), and embalming the body without obtaining approval (*Harry and Bryant Co. v. F.T.C., supra,* at p. 1000). Providers may charge customers a nondeclinable basic service fee, if accompanied with the proper disclosure. (16 C.F.R. § 453.4(b)(1)(ii) (2008).)[5]

---

[4] There are 16 specific categories of goods and services that must be included in the mandatory GPL: (1) forwarding of remains to another funeral home; (2) receiving remains from another funeral home; (3) direct cremations; (4) immediate burials; (5) transfer of remains to the funeral home; (6) embalming; (7) other preparation of the body; (8) use of facilities and staff for viewing; (9) use of facilities and staff for the funeral ceremony; (10) use of facilities and staff for the memorial service; (11) use of equipment and staff for the graveside service; (12) the hearse; (13) the limousine service; (14) the casket; (15) outer burial containers; and (16) the nondeclinable basic services fee. (16 C.F.R. § 453.2(b)(4) (2008).)

A separate casket pricelist must be provided "to people who inquire in person about the offerings or prices of caskets or alternative containers." (16 C.F.R. § 453.2(b)(2) (2008).)

[5] 16 Code of Federal Regulations part 453.1(p) (2008) provides: "*Services of funeral director and staff.* The 'services of funeral director and staff' are the basic services, not to be included in prices of other categories in §453.2(b)(4), that are furnished by a funeral provider in arranging any funeral, such as conducting the arrangements conference, planning the funeral, obtaining necessary permits, and placing obituary notices."

## C. *The cash advance provisions*

Part 453.3 of 16 Code of Federal Regulations (2008) prohibits certain misrepresentations by funeral providers (identified in the rule as "deceptive acts or practices") and provides explicit preventative measures.

The subject of this appeal is the cash advance provisions contained in subdivision (f) of 16 Code of Federal Regulations part 453.3 (2008) and the definitional provision in part 453.1(b).

16 Code of Federal Regulations part 453.3(f) (2008) provides:

"(f) *Cash advance provisions—*

"(1) *Deceptive acts or practices.* In selling or offering to sell funeral goods or funeral services to the public, it is a deceptive act or practice for a funeral provider to:

"(i) Represent that the price charged for a cash advance item is the same as the cost to the funeral provider for the item when such is not the case;

"(ii) Fail to disclose to persons arranging funerals that the price being charged for a cash advance item is not the same as the cost to the funeral provider for the item when such is the case.

"(2) *Preventive requirements.* To prevent these deceptive acts or practices, funeral providers must place the following sentence in the itemized statement of funeral goods and services selected, in immediate conjunction with the list of itemized cash advance items required by §453.2(b)(5)(i)(B): 'We charge you for our services in obtaining: (specify cash advance items),' if the funeral provider makes a charge upon, or receives and retains a rebate, commission or trade or volume discount upon a cash advance item."

16 Code of Federal Regulations part 453.1(b) (2008) defines a "cash advance item" as: "any item of service or merchandise described to a purchaser as a 'cash advance,' 'accommodation,' 'cash disbursement,' or similar term. A cash advance item is also any item obtained from a third party and paid for by the funeral provider on the purchaser's behalf. Cash advance items may include, but are not limited to: cemetery or crematory services; pallbearers; public transportation; clergy honoraria; flowers; musicians or singers; nurses; obituary notices; gratuities and death certificates."

When the Commission promulgated the Funeral Rule in 1982, it explained why it included protective measures with regard to cash advance items as follows:

"(a) *Evidence*. In a typical funeral transaction, the consumer often pays the funeral provider for so-called 'cash advance' items. These items are goods and services which the funeral provider arranges to purchase but which are actually provided by a third party, *e.g.*, flowers, obituary notices, limousine rentals. Many funeral providers charge a markup on these items, or they may simply charge consumers the full price for the cash advance item and receive a rebate or volume discount from the supplier for the cash advance item. [¶] The Commission does not suggest that it is improper for funeral providers to profit on items obtained from third parties. It is clear that it is wholly proper for providers to do so. Moreover, it is clear that the services or goods being received by consumers, (*e.g.*, flowers, obituary notices etc.) are goods which they do wish to purchase. If, with knowledge that the funeral provider will profit from ordering flowers or arranging obituary notices, a consumer chooses to use the services of a funeral provider, a charge for that service should be anticipated. However, the undisclosed charging of a markup for cash advance items is deceptive because consumers believe that items labeled 'cash advances,' 'accommodation' or 'cash disbursement' are being provided at cost. There is an implicit representation that the cash advance transaction involves merely a forwarding of cash by the funeral provider and a subsequent dollar-for-dollar reimbursement by the consumer. [¶] In spite of this, the evidence demonstrates that many individual funeral providers do charge markups for cash advances. . . . In addition, there is evidence . . . that funeral directors charge more than they pay for items generally considered to be cash advances.[6] [¶] Similarly, the failure to disclose that a markup will be included on a cash advance item misleads consumers who rely on their reasonable expectations. In ordinary usage, terms such as 'cash advance,' 'accommodation items' or 'cash advanced for your convenience' imply that the consumer is being charged only for the actual cash outlay. The use of this term in connection with items such as flowers, obituary notices, etc., which the consumer could easily obtain from a third party, creates the expectation that the amount billed the consumer is the same as the amount paid by the funeral provider. Given this expectation, the failure to disclose the existence of a markup is a deceptive practice.

"(b) *Provisions*. Section 453.3(f) defines as deceptive: (1) affirmative misrepresentations that the price charged for a cash advance item is the same as the funeral provider's cost; and (2) the failure to disclose to consumers that a markup is being charged on a cash advance item. In order to prevent these practices, §453.3(f)(2) requires that funeral providers who charge a markup on cash advances disclose this fact on the general price list. It is important to note that this rule provision covers only those situations where the funeral provider makes an affirmative representation that an item is a cash advance,

---

[6] "In none of these instances is it clear whether the items were specifically labeled cash advances. However, they are of a type that are traditionally considered cash advance items."

accommodation, cash disbursement item, or any term of similar import. While it may be true that some items are viewed by consumers as inherently 'cash advances,' the record in this proceeding does not warrant such a finding. [¶] The Commission believes that requiring a disclosure that a markup is being used is a sufficient remedy in light of the evidence discussed below. Prior versions of the rule would have totally prohibited a profit on such items. The Commission has rejected such a remedy because it views the remedy it has selected as being sufficient to correct the identified abuse, while constituting the minimum intrusion into the business practices of the providers." (47 Fed.Reg. 42260, 42278–42279 (Sept. 24, 1982), most fns. omitted.)

### D. *Mirabal did not violate the cash advance provisions of the Funeral Rule.*

Baudino contends that the "disclosure requirements of [the Funeral Rule] are clearly triggered if [Mirabal purchases] any funeral good or service from a third party for resale to a consumer at a higher price." Baudino argues that the charges for the four items in issue (embalming, other preparation, first call transportation services, and the casket) were cash advance items because these goods and services were purchased by Mirabal "on her behalf" from third party vendors and she was charged more than Mirabal had paid. Thus, Baudino contends that Mirabal was required to disclose that it was imposing a markup with regard to these four items.

In making her argument, Baudino focuses only on the second sentence of the cash advance definition. (16 C.F.R. § 453.1(b) (2008) ["A cash advance item is also any item obtained from a third party and paid for by the funeral provider on the purchaser's behalf."].) However, Baudino's analysis ignores other language in 16 Code of Federal Regulations part 453.1(b) (2008) defining a "cash advance item," the purpose of the cash advance provision, the interpretation given to this term by the regulatory agency that promulgated it, and the ruling of another court that has examined it. Additionally, Baudino's interpretation is overbroad and illogical.

First, Baudino's conceptualization contradicts the purpose of the cash advance provision in the Funeral Rule and the language used to define a cash advance item. Funeral providers are not prohibited from making a profit on items they buy from one source and then sell to consumers. Rather, the cash advance provisions of the Funeral Rule include only those items that the funeral provider represents expressly to be "cash advance items," use words to that effect such as "accommodation" or "cash disbursement," or represent by implication that the goods or services are being provided to the customer at the same price the provider paid for them. The vice to be remedied by the rule is an explicit or implicit misrepresentation. The rule is designed to

remedy the perceived deception when consumers are led to reasonably believe that they are paying the same amount the funeral provider has paid to the third party vendor, yet the provider has added a markup or has received a rebate or volume discount. When there are no such representations, the goods or services are not cash advance items and the provider need not warn the consumer that it has made "a charge upon, or receive[d] and retain[ed] a rebate, commission or trade or volume discount . . . ." (16 C.F.R. § 453.3(f)(2) (2008).)

■ The definition of a cash advance item (16 C.F.R. § 453.1(b) (2008)) is consistent with its purpose of protecting consumers from explicit and implicit misrepresentations. The first definitional sentence refers to those situations where a provider specifically informs the consumer that an item is being purchased for his or her benefit. It states that a "cash advance" item is "any item of service or merchandise described to a purchaser as a 'cash advance,' 'accommodation,' 'cash disbursement,' or similar term." The second definitional sentence, the sentence relied upon by Baudino, refers to those situations where the provider purports to act on behalf of the customer as a procurer of goods or services, but does not expressly label the transaction in this manner. The second sentence reads: "A cash advance item is also any item obtained from a third party and paid for by the funeral provider on the purchaser's behalf." (16 C.F.R. § 453.1(b) (2008).) The last sentence in the definition illustrates the rule with a list of goods and services that funeral providers *may* treat as cash advance items, depending upon the circumstances. The last, or third sentence, reads: "Cash advance items may include, but are not limited to: cemetery or crematory services; pallbearers; public transportation; clergy honoraria; flowers; musicians or singers; nurses; obituary notices; gratuities and death certificates." (*Ibid.*) This nonexclusive list provides examples where, in some scenarios, a consumer can easily obtain the goods and services from a third party. The examples demonstrate situations where there can be "an implicit representation that the cash advance transaction involves merely a forwarding of cash by the funeral provider and a subsequent dollar-for-dollar reimbursement by the consumer." (47 Fed.Reg. 42260, 42278 (Sept. 24, 1982), fn. omitted.) The items in section II of Baudino's contract provide examples of goods and services that fall into this third definitional provision. Baudino reasonably believed that as an accommodation Mirabal obtained certified copies of death certificates, paid an honorarium to clergy, and paid for the cost of disposition permits. As Baudino expected, she paid Mirabal the exact cost of these items, dollar for dollar. Had Mirabal charged a surcharge for these items, it would have been obligated to notify Baudino that it was making a profit on them.[7]

---

[7] In 1985, after the Funeral Rule was promulgated, staff at the FTC published guidelines to assist the industry. (50 Fed.Reg. 28062 (July 9, 1985).) Baudino asserts that the following guideline advances her argument: "*Illustration 13*: You are a funeral provider who does not

Baudino's analysis of the definitional language in 16 Code of Federal Regulations part 453.1(b) (2008) also is inconsistent with the organization of the rule that distinguishes funeral goods and services selected from a provider's retail list from cash advance items. When funeral arrangement discussions are concluded, the Funeral Rule requires funeral providers to give each consumer an itemized statement of funeral goods and services selected. (16 C.F.R. § 453.2(b)(5) (2008).) In contrast to the required advance price disclosures, the itemized statement must include: "(A) The funeral goods and funeral services selected . . . [;] [¶] (B) Specifically itemized cash advance items . . . [;] and [¶] (C) The total cost of the goods and services selected." (16 C.F.R. § 453.2(b)(5)(i)(A)–(C) (2008).) The substantive cash advance disclosure provision in 16 Code of Federal Regulations part 453.3(f)(2) (2008) applies only to part 453.2(b)(5)(i)(B) (2008). It does not refer to part 453.2(b)(5)(i)(A) (2008), the items listed on the mandated advance *retail* pricelist.

Baudino's interpretation of the cash advance provisions of the Funeral Rule has already been presented to, and rejected by, the FTC. As the FTC has already concluded, Baudino's characterization of the term "cash advance item" is overbroad.

On April 12, 2005, a Texas legislator requested the Commission clarify the definition of the term "cash advance item." Specifically, the Texas state representative asked "whether a Texas trial court is correct in ruling that 'all goods or services purchased from a third-party vendor, even though not included on the contract, are "cash advances" ' under the Funeral Rule."[8]

own limousines. Rather, you arrange to rent limousines from third parties when needed. Must the limousine fee be listed on the General Price List? [¶] *No.* In these circumstances, the limousine is a cash advance item because it is an item obtained from a third party and paid for by a funeral provider on the purchaser's behalf. Therefore, in the event you do not own a limousine, you do not have to list it on the General Price List. When a family asks you to arrange for limousine service, the Rule requires that you disclose the price on the statement of goods and services selected." (50 Fed.Reg. 28062, 28070–28071 (July 9, 1985).)

Contrary to Baudino's argument, this illustration does not mean that *all* purchases of limousine services by a customer are cash advance items. Rather, such services are considered cash advance items only when there is an express or implied representation that the provider is obtaining these services for the consumer with the expectation that the cost to the consumer is the same as the cost to the provider.

We further note that the current version of the guidelines does not contain the illustrated example that appeared in the 1985 guidelines. As of December 23, 2008, the date we filed this opinion, the June 2004 publication entitled "Complying With the Funeral Rule" can be found at: <http://www.ftc.gov/bcp/edu/pubs/business/adv/bus05.shtm> and <http://www.ftc.gov/bcp/edu/pubs/business/adv/bus05.pdf>.

[8] In 2002, in *SCI Texas Funeral Services, Inc. v. Hijar, supra,* 214 S.W.3d 148, the Texas Court of Appeals reversed the Texas trial court, holding that the plaintiffs lacked standing. (*Id.* at p. 154.) The Texas Court of Appeals did not address the legal issue raised by the Texas legislator.

In a July 7, 2005 letter, the full Commission responded to the request.[9] In its nonbinding analysis, the Commission concluded that the Texas trial court's ruling was "incorrect in ruling that *all* goods or services purchased from a third-party vendor are cash advance items. [That] interpretation sweeps far too broadly, potentially bringing within its scope every component good or service that comprise a funeral. [Rather,] the term 'cash advance item' . . . applies only to those items that the funeral provider represents expressly to be 'cash advance items' or represents by implication to be procured on behalf of a particular customer and provided to that customer at the same price the funeral provider paid for them."

In its July 7, 2005 letter, the Commission stated that "reasonable consumers generally understand that the price charged by a retail seller—including funeral providers—includes profit. Thus, the corrective disclosure about cash advance items . . . is unnecessary when the funeral provider does not mislead the customer through either express representations that the item is a 'cash advance item' (or alternative formulations), or implied representations that the customer is paying no more for an item than the amount the funeral provider paid for it." Thus, the Commission concluded that cash advance regulations in the Funeral Rule are inapplicable unless consumers expect to receive the goods or services at cost.

Baudino's interpretation of the rule also has been rejected by the District of Columbia Circuit. In 2007, *Funeral Consumer Alliance, Inc. v. F.T.C., supra,* 481 F.3d 860, was called upon to assess the effect of the Commission's July 7, 2005 letter. The District of Columbia Circuit held that the letter was not a substantive amendment to the Funeral Rule and thus, was not subject to review under the Federal Trade Commission Act (15 U.S.C. § 41 et seq.). (*Funeral Consumer Alliance, Inc. v. F.T.C., supra,* at p. 863.) As part of its analysis, the District of Columbia Circuit looked at the Commission's July 2005 letter and acknowledged that the definition of cash advance item in 16 Code of Federal Regulations part 453.1(b) (2008) included two parts. The first, as detailed in the preamble to the Funeral Rule, is where providers expressly used terminology implying "that the consumer is being charged only for the actual cash outlay." (*Funeral Consumer Alliance, Inc. v. F.T.C., supra,* at p. 863.) Relying on the Commission's 2005 letter, the District of Columbia Circuit stated that the second type of cash advance item "is also limited to situations in which there is an implicit representation of at-cost pricing by the funeral provider." (*Id.* at p. 864.) "More specifically, the second sentence of the definition was intended—'to deter the less scrupulous funeral provider from evading the Rule by eschewing express description of an item as a "cash advance item" (or alternative formulations), yet nevertheless conveying to a customer acting reasonably under the circumstances that

---

[9] The letter was presented to the trial court in the summary judgment proceedings.

obtaining the item involves merely a forwarding of cash by the funeral provider and a subsequent dollar-for-dollar reimbursement by the customer. . . .' . . . [T]he second sentence of the definition is designed to cover situations that are functionally identical to those described in the first sentence—notwithstanding the absence of the magic words . . . . [¶] . . . If a consumer *expects* to pay a markup on the price of a cash advance item, then the funeral provider does not act 'deceptively' or 'unfairly' by charging such a markup. [Citation.]" (*Ibid.*, fn. omitted.) Thus, the court in *Funeral Consumer Alliance, Inc. v. F.T.C.*, rejected the same argument Baudino makes in the present appeal.

Lastly, Baudino's analysis leads to the illogical result that funeral providers must reveal *all* markups for goods and services it provides customers if those items have been obtained from third party providers. It cannot be per se unfair or deceptive for a funeral provider to charge markups on all goods and services it provides to its customers. (47 Fed.Reg. 42260, 42278 (Sept. 24, 1982) ["If, with knowledge that the funeral provider will profit from ordering flowers or arranging obituary notices, a consumer chooses to use the services of a funeral provider, a charge for that service should be anticipated."].) It is not "improper for funeral providers to profit on items obtained from third parties." (47 Fed.Reg. 42260, 42278 (Sept. 24, 1982).) Rather, "funeral providers violate the Rule only when they charge markups to customers who do not expect to pay such charges." (*Funeral Consumer Alliance, Inc. v. F.T.C., supra*, 481 F.3d at p. 864, fn. 2; 47 Fed.Reg. 42260, 42279 (Sept. 24, 1982) ["Given this expectation [of at-cost pricing], the failure to disclose the existence of a markup is a deceptive practice."].)

■ Therefore, contrary to Baudino's position, the Funeral Rule is not triggered solely because funeral goods or services are purchased from a third party for resale to a consumer at a higher price.

■ Given this analysis of the Funeral Rule, Mirabal did not violate the cash advance provisions of the rule. The embalming, other preparation (dressing, casketing, cosmetizing, and otherwise preparing Mr. Alcarez's remains for viewing), first call transportation services, and the casket were all obtained from third party vendors as part of the funeral services provided to Baudino. Baudino could not have obtained the services herself because Snyder Embalming Service and East Accommodations, Inc., only worked directly with members of the funeral industry. Baudino could not have obtained the casket directly from Batesville Casket Company because this

company only sold its products to licensed funeral establishments. There is no information that Baudino was told, led to believe, or should have understood, that she would be paying the same price Mirabal paid for these services and items. There is no information Baudino expected that Mirabal was acting as her procurement agent in obtaining these four items.[10] Mirabal bought the goods and services wholesale, marked the prices up to make a profit, and then sold them to Baudino. This is no different from thousands of business transactions in which the business expects to make a profit.

### E. *Baudino's other contentions are not persuasive.*

Baudino contends that she should be able to pursue her breach of contract cause of action. To make this argument, Baudino examines section II of the contract which had boxes next to a list of items. The following statement appeared at the bottom of the list: "We charge you for our services in obtaining those items marked with an 'X.'" Only three items had costs associated with them: $33 for certified copies of death certificates, $100 for clergy/religious facility (clergy honorarium), and $7 for permits (disposition of remains permits). There can be no breach of contract inasmuch as Mirabal charged Baudino the exact same amount as it had paid for these three cash advance items. Contrary to Baudino's claim, and as discussed above, Mirabal was not required to inform Baudino that it had made a profit by way of a markup on the embalming, other preparation, first call transportation, or the casket. Her breach of contract contention, as well as the associated argument that the failure to add other items to those listed in section II, simply repackages the cash advance arguments we rejected above. (See, *ante*, fn. 9.)

Baudino's contention that the trial court erred in sustaining the demurrers without leave to amend and in denying her motion to amend the complaint (*Schifando v. City of Los Angeles, supra*, 31 Cal.4th at p. 1081 [trial court abuses discretion in sustaining demurrer without leave to amend if defect can be cured by amendment]) is also unpersuasive. Baudino's proposed amendments do not alter the premise of Baudino's complaint in which she alleged that the Funeral Rule's cash advance provisions were violated.

---

[10] Baudino suggests there was an implied misrepresentation because the four items in issue were listed in section I of the contract, which did not contain language similar to the phrase "charges to be incurred by us on your behalf" found in section II. However, the items delineated in section II of the contract (certified copies of the death certificate, honorarium paid to clergy, and disposition permits) required that explanatory language because Baudino would reasonably understand Mirabal would be obtaining these items for her as an accommodation.

## V.

## DISPOSITION

The judgments entered against Baudino and in favor of SCI California Funeral Services, Inc., doing business as Mirabal Mortuary, Service Corporation International, SCI Funeral Services, Inc., an Iowa corporation, and SCI Management LP, a Delaware limited partnership, are affirmed. Baudino is to pay all costs on appeal.

Klein, P. J., and Croskey, J., concurred.